## Hoskins, et al. v. Northern Lee Oil & Gas Company.

(Decided May 2, 1922.)

### Appeal from Lee Circuit Court.

1. Mines and Minerals—Rights of Adverse Claimants.—Where two adverse claimants of land execute to two different persons leases for oil and gas on the same tract of land, each reserving a one-eighth royalty in the oil and gas found on the premises, and said leases are afterwards assigned by the lessees to a common sublessee who develops the property and finds oil and gas in paying quantities thereon, the right of the two said lessors to the one-eighth royalty depends upon which one is the owner of the true and perfect title.

2. Mines and Minerals—Reservations.—A deed of conveyance which contains a reservation in the following terms: "Saving and excepting therefrom and from this conveyance all the coal, iron, oil, gas and minerals of any and every sort and description, with the right of egress and ingress to mine and work for and remove the said coal, iron, gas or oils, without any charge to the grantor," does not pass to the grantee the oil and gas in the land conveyed.

3. Evidence—Title Bond With Interlineations—Burden of Proof.—A title bond on the face of which appear erasures, interlineations and other changes, will not be received in evidence until sufficient testimony to make out a prima facie case of its authenticity and to explain the erasures, interlineations or changes has been heard by the court, the burden being upon the party offering such paper when challenged to account to the court for such changes and alterations as appear upon the face of it.

4. Evidence—Title Bond—Execution of—Interlineations.—Where the only evidence offered to prove the execution of a title bond is that of the person in whose hands it is found, who states that the bond was written by one of the grantors at a certain time and place, and that the interlineations and changes shown on the face of the bond were made at the same time and place and by the same person, and the adverse party proves by such alleged grantor that the title bond was not made at the time and place stated by the witness, nor at any other time and place; that neither of them signed it or knew of its existence, and it further appears from an examination of the writing that the body of it is written in one hand with a certain character of pen and ink and the interlineations in the face of the bond are written by a different hand and with different pen and ink, and these interlineations are of the essence of the bond, and it further appearing that the bond is not in the handwriting of the person alleged to have written it, it must be rejected as spurious and no title will be adjudged to pass under or by it.

ROSE & STAMPER and J. F. SUTTON for appellants.

CHESTER GOURLEY, H. D. PARRISH and ROBERTS & PEN-DERGRASS for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

The real question in the case presented by this appeal is, who is the true owner of the oil and gas in and under the eight-acre tract of land, in Lee county, on which appellee, Malissa Norman, now lives and claims both the surface and the mineral. A very large part of the record is devoted to the presentation for construction of a written contract of date May 4, 1920, between the Northern Lee Oil & Gas Company of the one part, and the assigns of two oil leases, executed by the two adverse claimants of the mineral in and under the said land. Each set of claimants assert title to a one-eighth royalty in the oil and gas under their lease of the land, which now has on it several good wells. The company refused to pay one-fourth royalty, one-eighth to each of them, but asserts it is willing to pay a royalty of one-eighth to the true owner of the mineral in the tract. A determination of the true ownership of the oil and gas under the lands in dispute will, we think, relieve the court of the necessity of devoting much space to the interpretation of the contract.

On December 25, 1901, James T. Maloney, then the owner of a 58-acre tract of land on Sugar Camp branch and Jack Mann's branch, in Lee county, sold and conveyed the same to John Coomer for the sum of $100.00, $5.00 of which was in hand paid and the balance evidenced by two promissory notes, the said Maloney retaining a lien upon the property for the security of the unpaid purchase money, and making the following reservations in the habendum clause:

"To have and to hold the same, together with all its appurtenances thereunto belonging to the said John Coomer, his heirs and assigns forever, saving and excepting therefrom and from this conveyance all the coal, iron, gas and oil of any and every sort or description, with the right of egress and ingress to mine and work and remove the said coal, iron, gas or oils, without any charge to the grantor."

Needless to say that it is admitted by all parties to this controversy that James T. Maloney, who is named grantor in said deed, did not divest himself of the oil and gas or other minerals mentioned by said conveyance, but on the contrary continued to own the same. The aforementioned deed was duly recorded in the office of the clerk of the Lee county court on the 30th day of De-

cember, 1901. On August 15, 1903, John Coomer, to whom the lands were conveyed, and his wife sold and by deed conveyed to Daniel B. Pence, of Lee county, all the aforesaid lands in consideration of $125.00 cash in hand paid, and this deed was signed by John Coomer and Margaret Ann Coomer, each by mark, and lodged for and recorded in the office of the clerk of the Lee county court on August 19, 1903. Afterwards and on March 8, 1909, D. B. Pence, to whom Coomer sold the land, conveyed to Lucy Norman, now Lucy Watkins, eight acres of the said 58-acre tract in consideration of $150.00, cash in hand paid. In the deed from Pence to Lucy Norman it is recited that the land conveyed "is a part of the land which was conveyed to the party of the first part (Pence) by deed from John Coomer and his wife dated 15th day of August, 1903, and recorded in the clerk's office of the Lee county court, Deed Book No. 12, page 119." Lucy Norman afterwards married Andy Watkins, and she and her husband on the 22nd day of February, 1917, sold and by deed conveyed the eight acres in question to her mother, appellee, Malissa Norman, for the recited consideration of $150.00 cash. Malissa Norman still owns and claims the eight acres, and on February 5, 1920, executed an oil and gas lease to A. M. Sutton, whereby Sutton was granted the right and privilege of mining and taking oil and gas from the said eight acres, and this is one of the leases which was later acquired by the Northern Lee Oil & Gas Company in its effort to conciliate the adverse claimants and bring about development of the said eight acres for oil and gas purposes.

On March 13, 1920, James T. Maloney and wife, in consideration of one dollar and one-eighth royalty, executed to Lee Kash an oil and gas lease upon the whole of the 58 acres, the surface of which he had conveyed to Coomer in 1901, and which 58 acres included and covered the eight acres claimed by Malissa Norman and on which she shortly theretofore executed an oil and gas lease to A. M. Sutton. This lease, with the one from Malissa Norman, passed from Lee Kash and others to the Northern Lee Oil & Gas Company under a written contract of date May 4, 1920, by which it is claimed by some of the appellants that the company agreed to pay certain additional royalties.

Recognizing the validity of the reservations of the oil and gas and other minerals made by James T. Maloney in his deed to the Coomers, of date December 26,

1901, Mrs. Malissa Norman bases her claim to the oil, gas and other minerals in the eight acres which she leased to Sutton not upon her deed through Coomer but upon an alleged title bond supposed to have been executed by John Coomer, Margaret Ann Coomer and James T. Maloney to D. B. Pence, on April 20, 1903, the original of which is before this court for its inspection. Maloney and those who claim the mineral rights under him assert that this title bond is a fabrication and that Maloney never made or executed it nor even had knowledge of its existence until about the time oil and gas were discovered in paying quantities in that community. If this title bond be not genuine then Malissa Norman did not own the oil and gas or other minerals in the eight acres which she claims, and her lease made to Sutton conferred no right upon him nor upon his assignees to take said minerals, and she is not entitled to claim and receive royalties from the oil and gas produced from the premises.

Where a party to an action claims real estate, or an interest therein, under and through a writing on the face of which there were erasures, interlineations or other evidences of mutilation, the genuineness of which is challenged by the opposing party, the burden is upon the party producing the paper to show by satisfactory evidence that the interlineations, erasures or mutilations in the writing were made or occurred before delivery, or, if subsequently, by agreement of the parties, or through some accident or misfortune, and the paper is not admissible until its authenticity has been established by sufficient evidence to make out a *prima facie* case. With this rule in mind let us examine the original title bond under which Malissa Norman claims the oil and gas. It purports to have been written on April 20, 1903, and is on a sheet of old-fashioned foolscap paper, now yellowed by age. The writing, which was done with pen and ink, is reasonably legible but gives unmistakable evidence of having been done by one not an expert in penmanship. In fact it appears to be the writing of one not accustomed to drawing such instruments or using a pen except at rare intervals. After the date the first word, "this," starts with a small letter when it should have been a capital. The first sentence reads: "this indenture made and entered into by and between John Coomer *and James Maloney* of the first partys D B Pence of the second part all of the county of lee and State of Ky. witnesseth." In the foregoing sentence the words,

*"and James Maloney"* are interlined in a different handwriting and with different pen point and ink. In other words, the writing as originally prepared read: "this indenture made and entered into by and between John Coomer of the first part D B Pence of the second part," and the words *"and James Maloney"* were omitted altogether. After the words "John Coomer of the first part" are added the two letters "ys" to the word "part," making it read "partys." This addition of the "ys" is likewise in a different ink and with a different pen and by a different hand. In the fourteenth line from the top the word "partys" bears evidence of changes and additions, for the letters "ys" appear to have been added to this word, it being plainly discernible that a part of the "y," which originally had a straight stem, and the whole of the "s" have been added. The names of John Coomer and Margaret Ann Coomer are signed by mark in the same ink and with the same hand and pen as that with which the original writing was done, but the name of James Maloney, which appears below the other two names, is in a different handwriting and with different pen and ink and is almost too dim now to be seen, although the other names appearing upon the same paper and within less than an inch from it are plain and clear. The ink used in writing the body of the alleged title bond was of good quality black fluid, while the interlineations were made with a faded, brownish black ink. There are other evidences of changes on the face of the paper which tend to stultify it. The evidence which Mrs. Norman adduced to prove the genuineness of the title bond is not at all satisfactory. The paper was found in the possession of D. B. Pence and a Mr. Norman, both of whom are closely related to appellee, Malissa Norman. Pence was her grantor. He testifies that he was present at the time of the making of the said title bond and that it was written in whole by James T. Maloney. He also stated that the writing was prepared at the home of John Coomer on the North Fork near the camp of the Swan Day Lumber Company, and that John Coomer and his wife, Margaret Ann Coomer, and James Maloney and himself were present, and that after it was written the instrument was read to them by James T. Maloney, and that the signatures of Margaret Ann Coomer, John Coomer and James T. Maloney were placed to the instrument at that time and place. Further testifying he said he did not know how the words "James Maloney" came to be interlined in

the writing nor how the other interlineations were made nor who made them, but admitted on cross-examination that he could see there was a difference in the ink used in writing different parts of the instrument. Further testifying he said that he purchased the mineral right which the title bond purports to convey from James Maloney to him and gave Maloney a red muley heifer of the value of about $25.00.

On the other hand, James T. Maloney, John Coomer and Margaret Ann Coomer all testify that no such instrument was ever prepared, read or signed by them or in their presence at the time and place mentioned by Pence, or at any time or place. Maloney says he did not write the paper, that it is not in his handwriting, and that he did not sign it or authorize another to do so nor deliver it or know anything about it until a short time before this litigation commenced, and that at that time it was in the hands of parties interested in the cause of Mrs. Norman and those claiming under the same title. He further states that he obtained from Pence a red muley heifer for which he paid him $25.00 in cash, and at the time took from him a written receipt signed by Pence, the original of which is exhibited in the record and made a part of the evidence. The evidence stands one for and three against the authenticity of the alleged title bond, and this is not all. The questioned writing purports to be merely a title bond by which Maloney obligated himself to join in a deed with the Coomers to Pence for the land, and although the Coomers made, executed and delivered to B. D. Pence a deed of general warranty for the said lands in 1903, only a few months after the date of the alleged title bond, James T. Maloney did not sign said deed, and the explanation given by Pence for his failure to have Maloney sign the deed is wholly unsatisfactory. The fact that Pence accepted the deed from Coomer and his wife for the land only a short time after the date of the alleged title bond without having Maloney join in the deed, as by the alleged title bond he was bound to do, is a very strong circumstance against the validity of the bond. The deed from the Coomers to pence recites that the Coomers derived title from J. T. Maloney. Another strong circumstance connected with the alleged title bond is that the name *James Maloney* is written both in the top of the bond and is so subscribed, whereas it appears that Maloney in the execution of other papers about that time always signed his name *J. T. Maloney*. It nowhere

appears as James Maloney except in this title bond. Still more strange is the fact that James Maloney in preparing the title bond from himself and the Coomers to Pence overlooked his own name and it had to be interlined later by a different person, using a different pen and ink from that employed in writing the original bond. Moreover, it is plain that the person who wrote the title bond did not write the name *James Maloney* at the bottom thereof, and this contradicts Pence wherein he says Maloney wrote the whole bond, for if he wrote the signature he did not write the bond. All these facts overwhelm us and convincingly prove that the title bond is a forgery, never having been signed, executed or delivered by James T. Maloney. This being true, Mrs. Malissa Norman owned only the surface of the eight acres which she undertook to lease to Sutton and was wholly unable to make a valid lease of the oil and gas in and under said land.

2. It is next insisted that Mrs. Norman acquired title to the oil and gas by adverse possession. The statutes of limitation do not run in favor of the owner and holder of the surface against the fee owner of the mineral estate in the same land; nor is a deed or other conveyance of mineral champertous merely because at the time of the conveyance the lands are possessed by another. The two estates, when once separated, remain independent and a prescriptive title to the mineral can never be acquired by merely holding and claiming the land, even though title be asserted in the mineral all the time. The possession of the surface owner is the possession of the owner of the mineral, under section 2366a, the two being amicable. The only way the statutes can be started running in favor of the surface holder as against the owner of the mineral is by the former taking actual possession of the mineral under claim of right by opening mines or wells and operating the same. When this possession has continued for the statutory period, title to the mineral by adverse possession is perfected. The opening of a coal bank or oil or gas wells for the purpose of taking only a small quantity of the mineral for domestic purposes and not with the avowed intention of acquiring title to the whole mineral estate does not start the statutes running. In fact entry on to or into the possession of the mineral estate in order to start the statutes of limitation running in favor of the claimant must be accompanied with such open, notorious and adverse

acts as would be sufficient to set the statutes running in favor of one in possession of the surface of the land. Ball, et al. v. Clark, Trustee, et al., 150 Ky. 383; Pond Creek Coal Co. v. Asa Runyon, etc., 161 Ky. 64.

3. Having reached the conclusion that appellee, Malissa Norman, owned no interest in the oil and gas at the time she executed the lease to Sutton, and that the title to all said mineral was reserved by James T. Maloney in his deed to Coomer and wife, but was later conveyed by Maloney and wife to Kash and others, who transferred it to appellee, Northern Lee Oil & Gas Company, and there being no provision in the contract of May 4, 1920, between the two Suttons, Kash and Eversole of the one part, and appellee Northern Lee Oil & Gas Company of the second part, by which appellee Malissa Norman was to have or receive a royalty from the said eight acres of land, it becomes unnecessary for the court to discuss or construe the said contract.

For the reasons indicated the judgment is reversed for proceedings consistent with this opinion.

Judgment reversed.