## Damron et al. v. Damron.
## Damron v. Damron et al.

Nov. 30, 1945.

Woodward, Dawson, Hobson & Fulton and E. B. Anderson for appellants.

Wilbur K. Miller and Hubert Meredith for appellees.

OPINION OF THE COURT BY JUDGE SIMS—Affirming.

These two appeals were argued and briefed together in this court and both will be disposed of in this opinion.

W. Wallace Damron, Sr., a resident of Owensboro, Kentucky, was killed in an automobile accident in Belleville, Illinois, on August 1, 1941. He died intestate the owner of a large personal estate, as well as considerable real property. The appeal of Mrs. Gertrude Hall Damron is from that part of the judgment of the chancellor

holding that she was not the widow of Mr. Damron, and the appeal of the administrator and the heirs of Damron is from so much of the judgment which upholds the deed Damron executed to Gertrude Hall. The two principals are often referred to in the record by their given names and we find it convenient to do so in the opinion.

Gertrude attempted to establish that she was Bill's widow by reason of a ceremonial marriage at Juarez, Mexico, on December 27, 1935. She further contends that should the Mexican marriage records fail to show that she and Bill were ceremonially married, then there was a common-law marriage entered into between them on the same day in El Paso, Texas. It is stipulated that Texas recognizes common-law marriage, and it is conceded that a marriage valid where it takes place is valid everywhere, except where against the public policy of the State, Gilbert v. Gilbert, 275 Ky. 559, 122 S. W. 2d 137. However, the chancellor held there was neither a ceremonial nor a common-law marriage, and we find his judgment is supported by the evidence.

Both Bill and Gertrude had been married and divorced and each had grown children. She went to work for him in Owensboro in 1933 as his secretary and in time she attended to much of his routine business, such as collecting rents, paying bills, etc., and she had authority to sign his name to checks. On Sunday December 22, 1935, he cashed checks aggregating $1,000 in Owensboro at the drugstore of his friend, Zeno Weir, and left by automobile with Gertrude and her fifteen year old daughter, Alice, saying he was going to El Paso, Texas, where he and Gertrude were to be married. They arrived in El Paso on the afternoon of the 27th and Gertrude testifies that she put Alice in a picture show and she and Bill went across the river to Juarez, Mexico, and were married by a Mexican official, J. G. Salaises, in the Civil Court of Vital Statistics.

Immediately after the ceremony they returned to El Paso, picked up Alice and told her of the wedding. That night the three stayed at a hotel in Juarez, she and Bill occupying one room and Alice another. The next day they returned to El Paso and the manager of the Hilton Hotel testified they were registered as "W. W. Damron and family" from December 28th to the 30th. Gertrude further testified that they occupied the same

room in this hotel and Alice had a room to herself; that when they left the Hilton they visited Bill's uncle at Tuscon for a day or so and then went to visit his mother in Mesa, Arizona, where they remained several weeks; that Bill introduced her to his uncle and mother as his wife and they returned to Kentucky in February.

Her testimony was that upon their return to Owensboro they kept their marriage secret because Bill wanted to work out the matter with his children; that they lived in separate apartments in the same building, but each had a key to the other's apartment and often slept together; that this arrangement continued until December 1940, when their living quarters became crowded while Bill's mother was visiting them and they moved into a new apartment and they openly lived together from that time.

On June 15, 1941, Gertrude and Bill had published in an Owensboro paper an announcement reading, "Mr. and Mrs. William W. Damron, St. Ann Apartments, announce the engagement of their daughter, Miss Alice Marie Hall, etc." Soon thereafter wedding invitations were issued in the name of "Mr. and Mrs. William W. Damron," for Alice's wedding on August 9 in the Episcopal Church. A calendar of that church on July 13, 1941, carried an item that Gertrude Griffith Damron and William Wallace Damron were the sponsors at the christening of Bill's granddaughter that day; also, "The flowers on the altar this morning were given by Mrs. W. W. Damron in memory of her mother, Mrs. W. A. Griffith." In the spring of 1941 Bill had a name plate "Mr. and Mrs. W. W. Damron" put on the door of a room he had furnished in the City Hospital.

There can be no doubt that after the announcement of Alice's approaching wedding Bill and Gertrude lived openly together as man and wife, but up until that time they never did so in Owensboro. They each made separate income tax returns as single persons. Bill executed all conveyances as a single man even as late as September 19, 1940. L. M. Savage (an attorney whose daughter married Bill's son) testified that in May 1941, Bill told him he was not married and spoke of "trying to make up with his first wife." A former business associate, Julius C. Miller, in the fall of 1939, told Bill he heard he was married and "that lots of people were

asking that question," to which Bill replied: "No I am not married, and that aint the half of it. I wouldn't marry the best woman that ever lived." On the other hand, his friends and children visited Bill and Gertrude in their home, and he held out to them that they were married.

The testimony in this voluminous record as to whether this couple before announcing Alice's marriage did or did not hold out to the public that they were married is about equiponderant, but their mode of life and the surrounding circumstances tips the scales in favor of the chancellor's judgment that they did not hold out generally that they were married.

Gertrude needed a copy of the Mexican marriage certificate to collect social security funds, and she, accompanied by Mr. and Mrs. Zeno Weir, drove to Juarez about the first of the year 1942 and obtained a typewritten paper purporting to be an English translation of that instrument. The administrator and his father-in-law became suspicious when they could not obtain from the Mexican authorities a photostatic copy of the marriage certificate, so they went out to Juarez in July 1942. Their examination of the marriage record showed a deplorable condition. There can be no doubt that somebody had clumsily changed the marriage record of Ross G. Sheridan and Maria Saucedo to read as the marriage record of Bill and Gertrude. We will not take the time and space necessary to point out just how this record was changed, other than to say that Bill's name shows it was written over Sheridan's and Gertrude's over Maria's. The alteration of this record was so apparent that Gertrude denied that she signed it, although Clark Sellers, a nationally known handwriting expert, Maxwell Allen, a handwriting expert of Louisville, and Hilton Snyder and Paul Lewis, officers of the First Owensboro Bank and Trust Company, all testified her signature on this altered marriage record was genuine; while Sellers and Allen testified that Bill's signature was a forgery. It is unnecessary to discuss the testimony of Reynaldo Acosta, a former clerk in Salaises' office, who confessed to altering this marriage record. But we do direct attention to the fact that the only record of Bill's and Gertrude's marriage is the altered or mutilated one to which reference has just been made.

Thus the ceremonial marriage vanishes and we are left to determine whether or not there was a common-law marriage.

The authorities seem to hold that to constitute a common-law marriage in Texas three elements are necessary: (1) There must be an agreement between the parties to become man and wife from that time on; (2) a living together as such pursuant to the agreement; (3) a holding out of each other to the public that they are husband and wife. The agreement may be express or implied and the marriage relation may be proven by circumstantial evidence, but consistently holding themselves out to the public as a married couple appears to be the acid test of a common-law marriage. Grigsby v. Reib, 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011; Martinez v. Martinez, Tex. Civ. App., 6 S. W. 2d 408; McChesney v. Johnson, Tex. Civ. App., 79 S. W. 2d 658; Hill v. Smith, Tex. Civ. App., 181 S. W. 2d 1015; Wristen v. Wristen, Tex. Civ. App., 119 S. W. 2d 1104 (all Texas cases). See also 35 Am. Jur., Marriage, sec. 29, p. 199; 33 A. L. R. 29; 94 A. L. R. 1000.

Here, the common-law marriage failed for the reason that from the time this couple returned to Kentucky in the early spring of 1936, until the announcement of Alice's wedding in June, 1941, they did not hold themselves out to the public generally as man and wife; indeed, they did not openly live together until December, 1940, when they occupied the same apartment. To some friends Bill said he was married, to others he denied it; and during all of this time Gertrude was acting as his secretary and receiving a salary from him, going under her name of Gertrude Hall, and he was transacting his business as a single man; and each was making their income tax returns as a single person. As was written in McChesney v. Johnson, Tex. Civ. App., 79 S. W. 2d 658, there must be consistency where the couple undertakes to prove by their daily life that they have entered into a common-law marriage and such a marriage is not the product of a relation which says, ''We are husband and wife today and we will be again next week, but since it suits our convenience we will deny that relation in the interim.''

The chancellor did not err in holding that the evi-

642

dence did not establish a common-law marriage between Bill and Gertrude.

We now take up the deed. The record shows that Bill went to the office of his attorney in Owensboro, Hon. E. B. Anderson, who was out for a moment, so he had Mr. Anderson's secretary draw two or three deeds for him, one of which conveyed the fee in an apartment building in Owensboro to Gertrude. Mr. Anderson returned soon after the deed was drawn and Bill took it into Anderson's private office. A few minutes later Mr. Anderson called in the secretary who had written the first deed conveying a fee and dictated to her a deed from Bill to Gertrude conveying the latter a life estate in this property. Mr. Anderson did not testify but his secretary, Mrs. Dorothy Hild, testified that Bill did not wait until she typed the dictated deed but said he would call later for it as he was not going to deliver it immediately but would put it in his lockbox. The deed before us was written on one page with the exception that the sentence, "In testimony whereof, witness the signature of the party of the first part this the day and year first written herein" started as a separate paragraph at the bottom of the first page and ran over on the second page where Damron's signature and his acknowledgment appear. Bill came back and signed and acknowledged the deed before a notary other than the one who wrote the two deeds, but neither of the young ladies could recollect as to what became of the deed conveying the fee to Gertrude.

It was testified by Gertrude that Bill delivered to her on the day it was executed a deed conveying her the fee to this property, which was put in her lockbox where it remained until a few days after Bill's death, when she lodged it for record on August 7, 1941. Mr. Sellers, the handwriting expert, qualified as an expert on the identification of typewriting, and his testimony is that the first page of the deed was not written by the same machine which typed the second page; that the watermark on the two pages of the deed is different. Indeed, after our attention had been called to the discrepancies in the typewriting on the separate pages of the deed, it is apparent that they were not written on the same typewriter, and the watermark on the two pages is not the same.

Counsel for Gertrude contend that possession by her of this deed established a strong presumption of a complete delivery of the deed and a transfer of title to her, which casts upon the one questioning the deed the burden of establishing by clear and convincing evidence the intention of the grantor was not to pass title, citing such cases as McHargue v. McHargue, 269 Ky. 355, 107 S. W. 2d 278; Preston v. Harlow, 276 Ky. 799, 125 S. W. 2d 726; Jones v. Driver, 282 Ky. 82, 137 S. W. 2d 729.

Opposing counsel insist that the rule applicable here is that where the face of the instrument indicates an alteration or where an alteration or a suspicious circumstance is proven by extrinsic evidence, the party producing the paper has the burden of proving the change was made under circumstances which render it lawful or which do not preclude recovery, such as the alteration was made before delivery, or that the grantor's consent was obtained or that it was subsequently ratified by him, citing such authorities as 3 C. J. S., Alteration of Instruments, sec. 90, p. 992; Darraugh v. Denny, 196 Ky. 614, 245 S. W. 152; Hoskins v. Northern Lee Oil & Gas Co., 194 Ky. 628, 240 S. W. 377; Phillips v. Board of Education, 283 Ky. 173, 140 S. W. 2d 819.

The authorities cited bear out the contentions of the respective parties. But Gertrude did not have to rely upon the possession of the deed establishing the presumption that it was delivered to her, as she testified it was so delivered by Bill the day he executed the paper. No witness contradicted her nor did the facts or circumstances. We will see later that she was a competent witness. When she testified as to the delivery of the deed to her in the same condition it now is, her testimony is again uncontradicted by any witness or any circumstance. Thus she met the burden of explaining the suspicions cast against the deed by showing it was in that condition when Bill delivered it to her.

This record shows Bill to have been one of those active, energetic men, who was inclined to be impulsive and headstrong, with little regard for conventionalities, either social or legal. Neither of the secretaries in Mr. Anderson's office could state what became of the deed Mrs. Hild wrote for Bill conveying the fee of this property to Gertrude. It cannot be doubted that Bill had a

deep attachment for Gertrude and respected her, and it is not at all unlike him to have taken the deed conveying the fee and have had the first page of that instrument retyped and then to have substituted it for the first page of the deed Mr. Anderson dictated conveying only a life estate and then to have delivered to Gertrude the very paper now before us. Evidently, this is the view the chancellor took of the matter and we are unable to say from this record that he was in error.

To meet the argument that Bill never acknowledged the deed conveying the fee but only acknowledged the one conveying a life estate, it is sufficient to say that as between the parties themselves the deed duly signed and delivered by Bill to Gertrude, and accepted by her, passed title, although not acknowledged. Travis v. Saunders, 198 Ky. 742, 249 S. W. 1040; Kerr v. Watkins, 234 Ky. 104, 27 S. W. 2d 679; Cornett v. Maddin, 277 Ky. 480, 126 S. W. 2d 871. Nor is it necessary that a deed of this character be supported by a consideration, since in the absence of fraud, legal incapacity or undue influence a person may make such disposition of his property as he pleases. Risner v. Risner, 261 Ky. 359, 87 S. W. 2d 970; Calveard v. Reynolds, 281 Ky. 518, 136 S. W. 2d 795.

Counsel representing the estate raised an objection to the competency of Gertrude's testimony as to conversations and transactions with Bill, relying upon section 606(2), Civil Code of Practice. But they took her deposition as if upon cross-examination in which she was questioned minutely by them as to the marriage as well as the deed, which deposition they filed as part of the record, and by so doing they waived the Code provision just mentioned. Hull v. Simon, 278 Ky. 442, 128 S. W. 2d 954; Martin v. Martin, 286 Ky. 408, 150 S. W. 2d 696.

Gertrude's counsel argue that the pleading attacking the deed did not meet the requirements of KRS sec. 61.060. No attack was made on the signature or the acknowledgment of the deed, but the plea was that the deed held by Gertrude was not the paper Bill signed and acknowledged. Therefore, the above mentioned section of the statute has no application. Byers v. First State Bank of Middlesboro, 159 Ky. 135, 166 S. W. 790; Christopher's Adm'r, v. Miniard, 267 Ky. 484, 102 S. W.

2d 978. Were the rule otherwise, no one could attack a deed for alterations in the body of the paper when the signature and the acknowledgment were free of fraud or mistake.

They further argue that a marriage cannot be collaterally attacked and that after the death of one of the spouses no third person may impeach the marriage, relying upon such authorities as 35 Am. Jur., Marriage, sec. 57, p. 220; Stevenson v. Gray, 17 B. Mon. 193, 56 Ky. 193; Johnson v. Sands, 276 Ky. 492, 124 S. W. 2d 774. But this action is not an attack upon a voidable marriage. The question here is whether or not any marriage ever existed and that may be inquired into in a collateral proceeding and after the death of a supposed spouse. McIlvain v. Scheibley, 109 Ky. 455, 59 S. W. 498.

We are of the opinion that the evidence supports the chancellor's finding that there was neither a ceremonial nor a common-law marriage between these parties; also, that the evidence supports his finding that the deed conveying to Gertrude the fee to the apartment property was valid; therefore, his judgment on both appeals is affirmed.