**CARROLL et al. v. CARROLL.**

Court of Appeals of Kentucky.
May 9, 1952.

Rehearing Denied Nov. 13, 1952.

H. R. Wilhoit, Grayson, for appellants.

Theobald & Theobald, Grayson, for appellee.

COMBS, Justice.

The only question in the case is whether Mary Bentley (Carroll), appellee, was the wife of R. J. Carroll at the time of his death. His heirs have appealed from a judgment that she was his wife.

R. J. Carroll died a resident of Carter County in December, 1950, at the age of 71. He was a prominent farmer and at one time had served as a justice of the peace. He and his first wife, who died in 1940, had raised a family of five children and accumulated considerable property. After the death of his wife he lived alone on his farm near Iron Hill in Carter County.

The appellee had lived in Carter County as a child but had for many years lived in Michigan, and later in Idaho with her first husband, Cy Frasure. In the winter of 1943 she brought the body of her father, who had died at her home in Idaho, to Carter County for burial. After the funeral she spent a few days in the neighborhood visiting relatives and friends and renewed her acquaintance with R. J. Carroll. It appears that Mr. Carroll, as justice of the peace, had performed the ceremony uniting her in marriage with Cy Frasure. She testified that after 1943 she returned to Carter County each year for visits of ten days to two weeks and saw R. J. Carroll on each of those visits. She secured a divorce from Frasure in February, 1945, although she says they had been separated since 1941.

In the summer of 1946 appellee moved into the home of R. J. Carroll and they cohabited as man and wife from that time until his death in 1950. It is admitted

they represented to their friends, neighbors and the general public that they were husband and wife. In his income tax returns for the years 1947, 1948 and 1949 Mr. Carroll listed appellee as his wife. He was in failing health and they spent the winter months of each year in Florida. In 1947 he purchased real estate in Florida and caused the deed to be made jointly to "R. J. Carroll and Mary Carroll, his wife." In January, 1947, they opened a joint bank account in Florida; in August, 1948, Mr. Carroll sold a farm in Carter County to a son, Nelson Carroll, one of the appellants here. Appellee was designated as a grantor and was referred to as the wife of R. J. Carroll. Mr. Carroll later executed a mineral lease on his farm, and appellee signed the lease as his wife.

The day after R. J. Carroll's funeral, appellee and some of his children by his first wife met in the office of the attorney who then and now represents the children, at which time there was some discussion about the administration of the decedent's estate. Some ten days later the parties again met in the same attorney's office and at that time appellee was informed there was a question about her marriage to the decedent. In response to questions by the attorney, she stated she and R. J. Carroll were married by a justice of the peace, in the presence of witnesses, at or near Ironton, Ohio, on the night of March 5, 1944. She later testified by deposition that she was mistaken about the date of her marriage and that the correct date is March 5, 1945.

Appellants place considerable emphasis on the change in appellee's testimony as to the date of the marriage. It is pointed out she was not divorced from her first husband until February, 1945, and it is implied that she deliberately changed her testimony so that the date of her marriage to the decedent would not conflict with the date of her divorce from her first husband. We do not place much significance on the confusion as to dates, although it is one weak link in the chain of circumstances upon which appellee relies. Of more significance is her testimony that immediately after the ceremony in March,

1945, she returned to Idaho and did not even see her new husband again until the summer of 1946.

Although appellee testified she and the decedent were married by a justice of the peace in Ironton, there is no other testimony on this point and it is stipulated there is no record of such a marriage. Although there is some question about the competency of appellee's testimony concerning the ceremony in Ironton, Civil Code of Practice, § 606(2), we think the competency of the testimony was waived by appellants when they introduced testimony in chief concerning appellee's statement as to the date of the ceremony. Appellee now relies mainly on a common law marriage which it is claimed was consummated in the state of Florida. Common law marriages are recognized both in Florida and Ohio, but there is no contention the parties entered into a common law marriage in Ohio.

We gather from the Chancellor's opinion, which is a part of the record, that he placed little reliance on appellee's testimony that she and decedent went through a ceremonial marriage in Ironton, and we are in full accord with his finding on this point. It seems inconceivable to us that such a ceremony could have taken place without appellee, who is represented by able counsel, being in position to present some evidence of the fact other than her bare statement that it occurred. It must be remembered that the ceremony is alleged to have taken place in 1945, a little more than five years before this action was instituted. So we are not dealing with a case where it might be expected that in the natural course of events the records might have been lost or destroyed, and the witnesses dead or removed.

The Chancellor's judgment is based on a finding of a common law marriage consummated in Florida and the decision in the case must turn on the correctness of that finding. It is conceded, of course, that if there was a common law marriage in Florida it will be recognized in this state, although it is generally stated that a common law marriage may not be consummated in Kentucky.

Appellee cites a number of cases which hold that the presumption of marriage by reputation is one of the strongest presumptions known to the law. We agree with that statement of the law but the rule is not applicable here. A presumption may be indulged only so long as there is no substantial evidence to the contrary. When that is offered, the presumption disappears, and the issues must be decided on the evidence. Prudential Insurance Company of America v. Tuggle's Adm'r, 254 Ky. 814, 72 S.W.2d 440; Dudley's Adm'r v. Fidelity & Deposit Co. of Maryland, Ky., 240 S.W.2d 76.

This Court has had before it in recent years two cases somewhat similar in facts to this case. In Damron v. Damron, 301 Ky. 636, 192 S.W.2d 741, Gertrude Hall Damron claimed to be the surviving wife of W. Wallace Damron by reason of a ceremonial marriage alleged to have taken place in Mexico, and in the alternative by reason of a common law marriage alleged to have been consummated in Texas. The ceremonial marriage was not established, and the Court held there was no common law marriage because there was an interval after the couple returned to Kentucky from Texas during which time they did not hold themselves out to the public generally as man and wife.

In Brown's Adm'r v. Brown, 308 Ky. 796, 215 S.W.2d 971, the facts are very similar to the facts here. The parties cohabited in Kentucky as man and wife without benefit of ceremony. For a period of several years they spent the winters in Florida, where they held themselves out to the public generally as man and wife. On their return to Kentucky after their visits in Florida, they continued the relationship of man and wife. It was held that a common law marriage had been consummated in Florida. There is at least one important distinction, however, between the two cases. In the Brown case a common law marriage in Florida was specifically pleaded and proved, whereas in the instant case the common law marriage is not pleaded, and the only evidence of such a marriage is the undisputed fact the parties lived together in Florida and held themselves out to the public generally as man and wife. It is not shown, and there is no reason to believe, that the relationship of the parties in Florida had any more dignity than a mere continuation of their illicit cohabitation in Kentucky. There was no attempt to prove any agreement in Florida to become husband and wife, although such an agreement is an essential element of a common law marriage. Marsicano v. Marsicano, 79 Fla. 278, 84 So. 156. We find nothing in the record on which to base a belief their relationship rose to the dignity of marriage merely because they crossed the state line into Florida.

The general rule is that where the relationship is meretricious in its inception, it will be presumed to continue so in the absence of evidence to the contrary. 55 C.J.S., Marriage, § 36, page 882; 55 C.J.S., Marriage, § 43 d (2), page 898; Brown's Adm'r v. Brown, supra, 308 Ky. 796, 215 S.W.2d 971. The appellee, by her testimony, has pitched her case on a ceremonial marriage in Ironton, which is entirely inconsistent with a common law marriage in Florida. In the case of Blackburn v. Crawfords, 3 Wall. 175, 18 L.Ed. 186, there was an attempt by the putative wife to rely on a common law marriage after having testified to a ceremonial marriage. In its discussion of the question, the Court said: "Her testimony was clear and positive. It was wholly inconsistent with such a proposition. If there was none (marriage) as alleged by her, clearly there was none at any time." Also see Kuhl v. Knauer, 7 B. Monroe 130, 46 Ky. 130.

We are reluctant to hold that these people were not married, but the same reasons which impel the Courts to protect the marriage institution preclude us from making any exception in favor of those who disregard the solemnities which experience has proved are necessary to protect the sanctity of that institution. It is possible that Mary Bentley believed in good faith she was married to Mr. Carroll, but we are unable to find in this record sufficient evidence to support such a finding.

The judgment is reversed with directions to enter one consistent with this opinion.